[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JUNE 30, 2003**
**THOMAS  K. KAHN**
**CLERK**

No. 01-16485

D. C. Docket No. 99-01259 CV-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

$242,484.00,

Defendant,

DEBORAH STANFORD, individually and as
President, Director, and Stockholder of
Mike's Import & Exports, U.S.A., a
Florida corporation,

Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 30, 2003)**
ON PETITION FOR REHEARING

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE*,
Judge.

_____
*Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting by
designation.

EDMONDSON, Chief Judge:

Appellee, the United States of America, filed a petition for rehearing. We deny the petition, but we withdraw our opinion of 22 January 2003 at 318 F.3d 1240 and substitute this opinion.

This appeal arises out of a civil forfeiture action applying 21 U.S.C. § 881(a)(6) -- the version in effect before the 2000 amendments -- which provides for the forfeiture of money linked to drug crimes.[1] The district court ordered the forfeiture of $242,484.00 seized from the claimant, Deborah Stanford. Stanford argues that the government lacked probable cause to support forfeiture of the defendant currency.[2] The district court saw probable cause as "admittedly a close

---

[1] 21 U.S.C. § 881(a) provides:
The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter [dealing with control of drugs].
(emphasis added)

[2] Because the forfeiture complaint was filed on 30 April 1999, the heightened burden of proof established by the Civil Asset Forfeiture Reform Act of 2000 does not apply to this case. See United States v. Cleckler, 270 F.3d 1331, 1334 n.2 (11th Cir. 2001)("the Civil Asset Forfeiture Reform Act of 2000 . . . became effective for any forfeiture commenced on or after 120 days from the enactment date of 25 April 2000").

question." Because we conclude the circumstances are insufficient to establish the needed probable cause, we reverse the forfeiture order.[3]

## BACKGROUND

Deborah Stanford is an American Citizen who was born in Surinam, South America, and lives in Miami. She is the owner and president of Mike's Import & Export U.S.A., Inc. (Mike's). Stanford's brother also played some role in Mike's operations during December 1999, when this seizure occurred. Mike's buys electronics, household and automotive goods and exports the items to South America. It is not unusual for Mike's to deal in cash. Mike's transactions are conducted in United States dollars due to the instability of the Surinamese guilder.

---

[3] Stanford also argues that the stop conducted at the Miami Airport was an unreasonable seizure in violation of the Fourth Amendment and that, therefore, the fruits of the seizure should have been suppressed at the forfeiture hearing. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetery Protective Ass'n, 108 S.Ct. 1319, 1323 (1988). Because we conclude that the government cannot establish probable cause even with the evidence obtained from the stop, we avoid this Fourth Amendment issue. For the same reason, we say nothing about whether the 2-3 hour interrogation of Stanford in the airport's DEA office was itself unreasonable and constituted an unconstitutional seizure.

In addition, Stanford argues the district court erred by saying that Mike's Import & Export U.S.A., Inc. lacked standing to contest the forfeiture. Because Mike's filed no claim, the district court correctly determined that Mike's lacked standing.

In December 1998, Stanford was in New York City.  She says that she was there to meet with her lawyer about a lawsuit involving a 1988 car accident. While in New York, she says that she was contacted by her brother and told to pick up some money for Mike's.  The cash money was delivered to her by Surinamese people whom she says she did not know.  Upon receipt of the money, Stanford counted it, separated it by denomination, and wrapped it in two packages. One package was wrapped in a black plastic and the other was wrapped in a Christmas bag.  The district court described the wrappings as a "cellophane-type material."

On 14 December, Stanford flew from New York to Miami.  Security workers at John F. Kennedy Airport (JFK) questioned her about the packages. She initially refused to tell security what was in the packages but then told them that the packages contained money.  Security allowed her to board her flight but notified the Drug Enforcement Administration (DEA) that a woman carrying a large amount of cash was traveling to Miami.[4]

---

[4] At least one Circuit has said that the use of Airport Security screeners to check for drugs and money and to report those items to law enforcement exceeds the permissible bounds of the security search and that all fruits of the screeners' search must be suppressed.  See United States v. $124,570.00, 873 F.2d 1240, 1247-48 (9th Cir. 1989); but see United States v. $557,933.89, 287 F.3d 66, 81-82 (2d Cir. 2002)("As long as the scope of that initial search comported with the Fourth Amendment -- i.e., was no more intrusive than necessary to accomplish its purpose of detecting weapons or explosives -- then it is of no constitutional moment that the object found was not what was sought.").  We note that $124,570.00 contained evidence indicating a greater entanglement

Believing that Stanford might be a currency courier for a drug organization, six Miami DEA agents, in three teams of two, went to the gate where Stanford's flight was scheduled to arrive. Agent Kenneth Miles saw Stanford as she walked out of the jet-way. He and Agent John Johnson approached her and identified themselves as DEA agents. Agent Miles testified that he explained to Stanford that part of his job was to ask people for their help in fighting the drug flow at the Airport.

At the agent's request, Stanford gave them her ticket and identification. They verified her name and returned the items. The agents asked her if she was carrying drugs or money; and she said she was carrying about $200,000 cash in her backpack.

Agent Miles, with Stanford's permission, looked into the backpack and saw a "Christmas bag type package." He poked a hole in the bag and could see bundles of cash inside. The cash was bundled by denomination. The bundles were not of uniform size and did not bear the binding of a bank or financial

---

between the security searches and federal law enforcement then is present on the facts before us; for example, the security screeners were paid by federal agents for reporting drugs and money. See $124,570.00, 873 F.2d at 1241. Stanford has not argued that the acts of the airport screeners exceeded the scope of a permissible search; and because we conclude that the government has not established probable cause even with the evidence that would have been excluded, we decline to address this issue.

institution. The Agents asked Stanford to accompany them to the DEA office, and she agreed.

At the office, Agent Miles asked Stanford why she was in New York. She said she was there because of her court case; but later, at one point during an interrogation lasting between two and three hours, she, according to the agents, once said she was in New York to pick up money. Stanford could not, or would not, identify where she stayed in New York or who gave her the cash other then to say (according to Agent Miles) that, while in New York, she was called by her brother who told her to meet some Surinamese people and pick up money for Mike's. She did not produce documentation connecting the currency to Mike's. When asked for the total amount of the cash, Stanford said that one bundle contained $79,900 and the other $162,750, a total of $242,650.

During the airport interrogation, "Rambo," a narcotics-detecting dog, was brought into the room. Stanford's backpack was placed in a hallway with other packages of similar size and shape. Rambo alerted to Stanford's backpack.[5] After the dog alert, Agent Miles prepared a receipt for the currency and gave the receipt to Stanford as confirmation of the seizure.

---

[5] The testimony on this alert is in conflict. Agent Miles testified Rambo was an aggressive alerting dog and that he observed Rambo scratch at the bag. Rambo's handler, Officer Pedro Perez, testified Rambo alerted by sitting in front of the bag and did not scratch it.

Stanford took the receipt and left the office.  The agents packed the money inside an evidence box.  On 15 December, the agents took the cash to SunTrust Bank and exchanged it for a cashier's check.  The bank counted the cash, determined that there was a total of $242,484 and issued a check for that amount.

After the seizure on 14 December 1998 and before the hearing on 25-27 September 2001, the DEA performed an investigation into the surrounding circumstances, including a check into Stanford's trip to New York and the business history of Mike's Import and Export USA, Inc.  The follow-up investigation revealed that Stanford, in Miami,  had purchased her 93-dollar round-trip airline ticket with cash and that she "no showed" for her first return flight to Miami and then twice changed her return date.  No evidence in the record indicates that Stanford had a history of involvement in drug crimes, and she was charged with no crimes in connection with these events.

DISCUSSION

Stanford argues that the government has made no showing of a connection between the money and controlled substances that rises above suspicion.  We will consider all the evidence to determine whether the government has met its burden

7

of establishing "probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute." United States v. $4,255,625.39, 762 F.2d 895, 903 (11th Cir. 1985) (quoting United States v. $364,960.00, 661 F.2d 319, 323 (5th Cir. Unit B 1981))(emphasis omitted). The probable cause standard demands less evidence than the preponderance-of-the-evidence standard. But the probable cause standard demands more powerful evidence than would allow some one to suspect – even reasonably to suspect – that a substantial connection exists between the pertinent property and a drug crime. "'Probable cause' refers to 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" Id. (quoting United States v. One 1978 Chevrolet Impala, 614 F.2d 983, 984 (5th Cir. 1980)). Probable cause exists when "the facts warrant a reasonably cautious person" to believe that the item to be forfeited is substantially related to drug crime. See e.g. United States v. Armstrong, 722 F.2d 681, 686 (11th Cir. 1984)(discussing probable cause in the context of a seizure). In this case, we stress that, because the forfeiture is pursuant to 21 U.S.C. § 881(a)(6), not just any criminal activity will support the forfeiture: the form of criminal wrongdoing must involve "the exchange of a controlled substance." Id.

"[T]he probable cause inquiry is a flexible one in which the court must consider the 'totality of the circumstances.'" United States v. $121,100.00, 999 F.2d 1503, 1506 (11th Cir. 1993). "In evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life . . . ." United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001)(internal quotation marks and citations omitted). When reviewing a forfeiture order, we accept the district court's fact findings unless clearly erroneous. United States v. $149,442.43, 965 F.2d 868, 876 (10th Cir. 1992). But in this Circuit one thing is clear: Whether the facts as found by the district court are sufficient to establish probable cause is a question of law which we review de novo. See $121,100.00, 999 F.2d at 1507.[6]

---

[6] Our probable cause inquiry, in this case, is limited to the evidence put forth by the government in support of probable cause. At the hearing, the government offered its evidence in support of probable cause. When the government rested, Stanford rested on the issue of probable cause and did not offer evidence. The district court then determined that probable cause had been established. Stanford proceeded to offer evidence on the issues of legitimate source and innocent ownership. "When a claimant presents no evidence to contradict the government's evidence of probable cause, the scope of review on appeal is whether the government's evidence established probable cause." United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale, 803 F.2d 625, 629-630 (11th Cir. 1986)(emphasis added). Because Stanford did not testify during the probable cause portion of the hearing, we do not consider Stanford's forfeiture-hearing testimony when we review whether the government established probable cause.

Some circuits require the government to establish probable cause only using evidence obtained prior to the filing of the forfeiture complaint. See United States v. One 1997 Toyota Land Cruiser, 248 F.3d 899, 902 (9th Cir. 2001); United States v. Parcels of Property at 255 Broadway, Hanover, 9 F.3d 1000, 1003 (1st Cir. 1993); United States v. $91,960.00, 897 F.2d 1457, 1462 (8th Cir. 1990). While we today do not limit (the question was not briefed and argued) the government's

9

The district court relied on these circumstances to support its finding of probable cause: (1) "the quantity of cash and its physical condition"; (2) "the route and circumstances surrounding Ms. Stanford's travel"; (3) "Ms. Stanford's lack of knowledge concerning the circumstances surrounding her trip to New York and the receipt of this money, including her inability to identify from whom she received it"; (4) "that Ms. Stanford twice was a 'no show' for her scheduled departure from New York to Miami"; and (5) a narcotics-dog alert on the cash.[7]

probable cause case to evidence obtained before the initiation of the forfeiture proceedings, the government must establish probable cause before the probable cause portion of the hearing is concluded. Once the claimant has established standing, if the government cannot establish its statutorily created right to the property by showing probable cause, the claimant's ability or inability to prove their right to the property is immaterial. See United States v. $557,933.89, 287 F.3d 66, 77 (2d Cir. 2002)("It must be remembered that what is adjudicated in a judicial civil forfeiture proceeding is the government's right to the property, not the claimant's. . . . [I]f the government fails [to establish its right to forfeiture], the property is not forfeited -- regardless of whether or not the claimant turns out to be the actual owner of the property.").

[7] The government also asks us to consider the Narcotics And Dangerous Drug Information System (NADDIS) report (indicating that a Florida business called Mike's might be a front for money laundering) and Stanford's supposed changing of her story while talking to the police. We will count them, but not for much. The district court said that the NADDIS report had slight relevance because of credibility issues: unreliable information ("'raw intelligence' information, not always thoroughly corroborated") is put into the system, making "the report's value in the probable cause case . . . negligible." Also, the district court observed that the "Mike's" entity named in NADDIS as "possibl[y] utilized for money laundering" had a different full name in the report than Ms. Stanford's business: "Mike's Import and Export USA, Inc." We agree that this particular report is worth very little in the probable cause analysis.

Despite making detailed findings of fact, the district court never said that Stanford changed her story, never said that Stanford lied to the Agents, and never discusses this allegation of story changing when making its probable cause determination. The only thing the district court said about the alleged changed story was that "[a]t trial, Agent Miles stated that at this point, Ms. Stanford had changed her story concerning the source of the money." Stanford had repeatedly said that she was in New York for her lawsuit. At one point during the course of the interview lasting between two and three hours, the agents claim she said that she was in New York to pick up money. Assuming

10

None of these things standing alone is sufficient to establish the needed probable cause. Always keeping in mind that probable cause is a totality-of-the-circumstances test, we will consider each element in turn to determine how much weight, if any, should be assessed to it as part of the whole. See United States v. $36,634.00, 103 F.3d 1048, 1054 (1st Cir. 1997).[8] In conducting this analysis, we recognize that probable cause is a fact-driven, case-by-case inquiry. Kinds of facts that may be suspicious in a particular case may not be suspicious in a different case involving different circumstances.

Carrying a large amount of cash can indicate criminal activity. But it is not illegal to transport money this way.[9] A large amount of cash does not -- alone -- satisfy the government's burden to show probable cause. $121,100.00, 999 F.2d

---

that she, at one point, did say that she was to pick up money, this evidence, in context, does not compel a finding of intentional deception on Stanford's part; and we believe the evidence has little value in the probable cause analysis.

By the way, the government at the hearing offered no transcript or tape recording of the agents' questioning of Ms. Stanford at the airport.

[8] We cannot possibly evaluate the totality of the circumstances without first understanding what the circumstances are. Then, we estimate how strongly they each indicate a connection to drug crime in the case at hand. We accept that in some cases the whole might be greater than the sum of its parts. But to determine whether the whole exceeds the threshold of probable cause, we first look at the parts. See generally United States v. $67,220.00, 957 F.2d 280, 285 (6th Cir. 1992).

[9] In saying this, we do not mean to imply that illegal conduct on the part of the claimant is somehow the standard for forfeiture. We merely observe that this conduct, while possibly suspicious, is perfectly legal and within Ms. Stanford's rights. For section 881(a)(6), probable cause cannot be interpreted so broadly as inherently to penalize legal conduct.

at 1506. In addition, to support a forfeiture under § 881, there must be a link to criminal activity which must be a narcotics transaction.

The manner in which this currency was bundled indicates that it did not come directly from a bank; and we suppose it could suggest some kind of illegal source. But the way this currency was bundled does not indicate a connection specifically to drugs.[10] The evidence presented in support of probable cause need not "point to drugs to the exclusion of all other theories." $121,100.00, 999 F.2d at 1508. But under § 881, the probable cause must be probable cause to believe a specific thing. Under §881(a)(6), the Government must evidence a connection -- beyond proof that a drug crime may be one of several similarly likely possibilities -- between the seized money and an illegal narcotics transaction. The way the

_____

[10] Stanford has never claimed that the currency came directly from a bank. She also told the agents that she had counted and repackaged the money. The money was bundled with rubber bands by denomination in non-uniform stacks. While the agents testified it was common for drug money to be bundled by denomination with rubber bands, Agent Johnson also testified it was unusual for drug money to be bundled in non-uniform stacks. Agent Johnson was asked "[y]our experience has shown you that currency that is intended for import or export is generally packaged in round sums or round amount lots, isn't it?" and responded "[u]sually." Although the question used the term "currency that is intended for import or export," it is apparent from the record that Johnson and the lawyer were talking about drug money. In a follow-up question, Agent Johnson was asked "when you have interdicted what you know . . . to be drug currency . . ., how many times have you seen bank notes packaged simply by denomination without regard to the actual dollar sum in each packet?" After asking for clarification, Johnson answered "Not usually." See also United States v. $321,470.00, 874 F.2d 298, 302 (5th Cir. 1989)("In narcotics, money is bundled in $1,000 and $5,000 bundles primarily . . . .").

12

money here was bundled, while possibly some suggestion of some criminal activity, assists hardly at all in making a more specific connection to drug crime.[11]

That the currency was wrapped to conceal its presence adds almost nothing. We accept that anyone traveling with a large amount of currency would try to conceal it for safety reasons. See $36,634.00, 103 F.3d at 1055 n. 8 ("There is little significance in the fact that [claimant's money] was concealed . . . [f]ew people carry money, especially large sums, in any way other than 'concealed.'"). As Agent Johnson testified, someone identified as having a large amount of currency could be robbed or killed. Stanford never hid that she was carrying currency from the authorities; when asked, she told both JFK Security and the DEA agents that she was carrying cash. Had Stanford actively attempted to hide the money from the authorities, the wrapping might be of more influence. But in this case, we cannot say that the currency being wrapped to conceal its presence indicates a connection to narcotics transactions as required by the

---

[11] The bundling assists in this way: by providing some evidence of possible illegality, it decreases the possibility that this currency derived from an entirely legal source. The bundling here, however, is only some suggestion of a possible illegal source and does nothing to differentiate between possible illegal sources. That is, the money -- if tied to some crime at all -- could just as easily be related to gun running, gambling, stolen goods, simple tax evasion or other criminal activity.

13

statute.[12]  While we recognize that the manner of concealment and transportation, taken together, is probative and  may raise suspicion about the source of the cash, we cannot ignore the weakness of the circumstantial evidence at issue here.

---

[12] In a parenthetical to one citation in their Appellee's brief, the government states that cellophane is commonly used by drug organizations to hide the smell of drugs on currency.  But when Agent Johnson in district court was asked to explain the significance of how the currency was wrapped, he only said that it was wrapped to prevent the currency from being readily visually recognized as currency; he said nothing about its being wrapped to conceal its odor.  This odor-avoidance factor was not argued to the district court; nor was it raised here except in the parenthetical to a citation. We know of only two published circuit court forfeiture cases that have said cellophane wrapped currency indicates a connection to drug activity: United States v. $129,727.00, 129 F.3d 486 (9th Cir. 1997)(currency wrapped with plastic wrap and fabric-softener, dryer sheets to conceal odor); and United States v. $42,500.00, 283 F.3d 977 (9th Cir. 2002). $129,727.00 presents an obviously different circumstance -- with clear evidence of an attempt to mask the smell (the dryer sheets are not needed to bundle the money)  -- than this case.  The $129,727.00 court said, "[t]he nexus between fabric softener and drug trafficking is recognized to be of great probative value." $129,727.00, 129 F.3d at 491.  $129,727.00 said nothing about a link between cellophane and drug trafficking when dryer sheets were not involved. Id.  Although $42,500.00 says nothing about dryer sheets, the only case it cited in support of the position that cellophane was used to conceal drug odor was $129,727.00 which was a dryer-sheet case. $42,500.00, 283 F.3d at 982.  In the case before us, the district court did not find that the currency was wrapped in cellophane and instead described the wrappings as "cellophane type material," which was consistent with some of the testimony in the district court.  The government's photographs purporting to show how the currency was wrapped do not show  cellophane: "a transparent, paper like product of viscose, impervious to moisture, germs, etc., used to wrap and package food, tobacco, etc." Random House Dictionary of the English Language 334 (2d ed. 1987).  The government here offered no evidence -- and the district court did not find -- that this "cellophane-type" wrapping has all the properties of cellophane or is used to mask (or even is capable of masking) the smell of drugs. Without the use of dryer sheets, or similar devices, we cannot say that the wrappings here indicated an active attempt to conceal the smell of drugs.

The district court did not find that the wrapping of the currency in this case indicated an effort to interfere with a dog's ability to smell drugs or any other substance on the currency.  We stress that no testimony in this record is to the effect that the wrapping materials in this case would make it more difficult or were likely intended to make it more difficult for a dog, human or machine to smell drug residue on the money.  These materials, in fact, seemingly did not hinder Rambo's ability to detect the scent of drugs.

Even if the wrapping factor had been fairly presented and argued, it would hardly count for much.  Stanford had to carry her currency somehow.

14

We recognize that travel from New York to Miami is an appropriate element to consider. Miami is a known center for drug smuggling and money laundering. $4,255,625.39, 762 F.2d at 904. New York is a money source city for drug activity. United States v. $129,727.00, 129 F.3d 486, 490 (9th Cir. 1997). Travel between source cities is circumstantial evidence of a possible connection between the money seized and narcotics transactions.[13] $4,255,625.39, 762 F.2d at 904. Combined with other circumstantial evidence, travel between these cities may be sufficient to establish probable cause. Id. But when combined with only other weak circumstantial evidence -- as here -- the "source city" element fails to draw a substantial connection to an illegal narcotics transaction.

We consider that Stanford purchased her ticket with cash. Business travelers often purchase airline tickets with credit cards or checks while drug

---

[13] At one time, travel between so called "source cities" might have been more compelling. But, as the number of "source cities" has increased their value to our probable-cause analysis has decreased. Agent Johnson testified that, in addition to New York and Miami, Washington, D.C., Detroit, Chicago, San Antonio, Los Angeles, San Francisco, Seattle, Tacoma, and Tampa are all considered "source cities." Our review of other cases adds Boston, Cleveland, Dallas, El Paso, Phoenix, San Diego, Schenectady, Tucson, Wilmington (North Carolina), the whole state of California, and the entire "upper midwest" to the list of locations that the DEA claims should increase our suspicion of a person's involvement with drug activity. At least one federal judge has asked whether all cities with international airports are "source cities." United States v. $141,770.00, 157 F.3d 600, 608 (8th Cir. 1998) (Davis, District Judge, sitting by designation, concurring in part and dissenting in part). The more "travel between source cities" comes to mean just "travel" the less persuasive it becomes in the probable cause analysis.

The persuasiveness of this factor is also somewhat degraded by the fact that Stanford lives in Miami and was returning home. We hesitate to say that every resident of Miami has one strike against them for forfeiture purposes should they choose to travel and to return home.

couriers often do not.[14] And this circumstance is an appropriate consideration

when evaluating probable cause in the totality. $121,100.00, 999 F.2d at 1507

(citing United States v. Socolow, 109 S.Ct. 1581, 1586 (1989)). But Stanford's

ticket only cost 93 dollars; given the low dollar amount of this ticket, it hardly

seems unusual that she paid cash. Cf. Socolow, 109 S.Ct. at 1586 (paying $2,100

cash for two airline tickets from roll of $20 bills is out of the ordinary); see also

$36,634.00, 103 F.3d at 1051 & 1055 n.9 (ticket cost $972.00 and noting the fact

the ticket was purchased with cash has limited probative value); $121,100.00, 999

F.2d at 1505 & 1507 (ticket cost $580).[15] We also consider, but place little weight

on, the fact that Stanford once "no showed" for her return flight and twice changed

her return itinerary. While we accept the government's contention that large drug

transactions may be delayed, we recognize that many travelers delay their flights

for entirely legitimate reasons. We know of no circuit court that has said a

changed itinerary is probative of a connection to drugs. The method Stanford used

---

[14] In saying this, we do not mean to imply that the government can obtain forfeiture by showing the claimant's acts deviated from some vague reasonable-business-person standard. Our standard is clear; the government must establish probable cause to believe that a substantial connection exists between the asset sought to be forfeited and an illegal drug transaction.

[15] In reviewing cases from other circuits, we have noticed that most cases do not indicate the cost of tickets purchased with cash. Of the cases that do, the costs are far greater then the cost of Stanford's ticket. The prices we have seen ranged from above $1000 to $443.

16

to pay for her airline ticket and the alteration of her travel arrangements does little (if anything) to connect the money to an exchange of controlled substances.

When interviewed by the federal agents, Stanford could not name the people from whom she received the money and could not provide business receipts for the money. But as a practical matter, when one has the money, it is the other party to the transaction that would seem to need receipts. The record is silent about whether a receipt was given to the people who delivered the money to Stanford. Stanford did identify for the agents the people generally: the people were Surinamese people who her brother said were giving her money for use in transactions with Mike's. Stanford's inability or unwillingness to tell the agents precisely where she stayed in New York is somewhat bothering. (We understand that many people may be reluctant -- for reasons unconnected to drug crime -- to disclose where they spent certain nights in their lives or to surrender their privacy during a "voluntary" questioning session with the police). Not answering police questions in detail (a kind of evasiveness) can be circumstantial evidence of possible criminal (but not necessarily drug-related) activity and will be considered in our probable cause inquiry. See $4,255,625.39, 762 F.2d at 904. But in the totality of the circumstances of this case, we cannot say this circumstantial evidence can count for much toward establishing probable cause to believe that a

substantial connection existed between the seized currency and a narcotics transaction.

We agree with the district court that "[t]he narcotics-detection dog's alert to the currency is also worth noting, although perhaps worth little else." The probative value of dog alerts to the smell of narcotics on currency has been called into question of late. See United States v. $506,231.00, 125 F.3d 442, 453 (7th Cir. 1997); United States v. $53,082.00, 985 F.2d 245, 250 n.5 (6th Cir. 1993). The testimony here indicated that as much as 80% of money in circulation may carry residue of narcotics.[16]

We also look to see whether the evidence surrounding Rambo's training and his alert assures us that the alert was accurate. Officer Perez, Rambo's handler, testified that Rambo would not alert to the smell of new currency, but he offered no evidence that Rambo would not alert to circulated currency. He only said that Rambo had been tested with, and did not alert to, <u>uncirculated</u> currency: currency that had never been exposed to drugs.[17] Officer Perez also testified that he did not

---

[16] It seems a bit ironic that, the day after the seizure, the DEA exchanged this drug-tainted currency for a cashier's check at SunTrust Bank, where the currency was, possibly, placed back into circulation for innocent people to possess.

[17] We understand that it is important to test Rambo on uncirculated currency. These tests tell us that Rambo was alerting to the smell of narcotics and not to the smell of the currency itself. This testing, however, does not ease our concern about the alert; we accept that Rambo reacted to the smell of drugs. But when as much as 80% of currency in circulation has drug residue on it -- as

know whether or not Rambo would alert to the trace amounts of drugs found on most currency. Further, Perez testified that he did not know how long a detectable scent of narcotics would remain on currency. Officer Perez's testimony does nothing to increase our confidence in Rambo's reaction.[18]

The value of Rambo's alert is further degraded by the conflicting testimony about the dog's reaction to Stanford's currency.[19] See United States v. $67,220.00, 957 F.2d 280, 286 (6th Cir. 1992)(vague testimony surrounding the dog alert weakened its value for probable cause). The dog alert, at best, tells us that this

---

testimony established -- we are concerned that Rambo would have the same reaction to 80% of the circulated currency placed in front of him; if so, the alert, as the district court concluded, is of little value.

For an example of a dog alert that, we believe, is much more probative than the one in this case, see United States v. $22,474.00, 246 F.3d 1212, 1216 (9th Cir. 2001). In $22,474.00, the government's evidence established that "the dog would not alert to cocaine residue found on currency in general circulation." Id. The government's undisputed evidence also established that "unless the currency . . . had recently been in the proximity of cocaine, the detection dog would not have alerted to it." Id. The government here did not offer this kind of evidence on Rambo's accuracy.

[18] Peter Nunez, the owner and director of the United States Canine Training Academy and Police Dog Training Center, also testified about Rambo's training. His testimony, like Officer Perez's, did nothing to ease the concern that Rambo would alert to the 80% of currency in circulation that is allegedly contaminated with drugs.

[19] This fact is not easily glossed over. Agent Miles testified "Rambo is an aggressive dog, which means that he scratches whenever he sees or smells something that he's trained to detect inside a package." Miles was then asked whether Rambo scratched at Ms. Stanford's bag and said "Yes." Officer Perez testified "my dog sits, other dogs are an aggressive alert, which they scratch when they find the narcotic." When describing the actual alert Perez said "my dog sat in front of the bag containing the money." But the district court said that Rambo alerted. Despite the conflicting evidence surrounding the alert, we cannot say that the district court's finding was clearly erroneous.

19

currency (like most circulated currency) may have been exposed, at some point, to narcotics. When combined with more compelling evidence of a connection to a narcotics transaction, this kind of dog alert may be probative; but it adds little in this case.

Our review of the record does not end here. Instead, we must look at all the evidence about probable cause. Here, the pertinent record contains facts that weaken the government's case on probable cause for a forfeiture. The first and perhaps most significant of these facts is that no evidence indicates that either Stanford or her brother has ever been charged with, implicated in, detained or investigated in association with a drug crime.[20] Nor is there evidence of a drug transaction with which the currency is associated. We are aware of only one forfeiture appeal in this Circuit that upholds probable cause where no evidence specifically indicated that the claimant or someone closely associated with the claimant was involved in drug transactions: $4,255,625.39.[21] As explained more

_____

[20] The present case is not a criminal case. In fact, the record does not indicate that anyone -- acquaintance, friend, or family member -- associated with Stanford has ever been involved in illegal activity. While the NADDIS report indicated that Mike's might be involved in money laundering, the report had so little reliability that the district court gave it no credence. We note also that the government has made no efforts to seize any assets of Mike's and has made no attempts to shut the business down (both reasonable courses of action if the government had evidence that Mike's was a front for illegal activity).

[21] Although we recognize that probable cause for a forfeiture can be established even if there is no direct evidence of some kind of drug activity, we also recognize that this result is rare. We are aware of only a few published circuit court opinions that conclude probable cause exists when direct

completely later, $4,255,625.39 presents a much more compelling case for forfeiture than is presented here.

Second, Stanford was traveling under her own name; she never denied that she was carrying currency; and she told the agents how much she was carrying. These circumstances are unusual in drug/currency cases. Couriers commonly travel under false names. For background, see $121,100.00, 999 F.2d at 1507; United States v. $25,000.00, 853 F.2d 1501, 1507 (9th Cir. 1988); United States v. $5,644,540.00, 799 F.2d 1357, 1360 (9th Cir. 1986); United States v. $13,000.00, 733 F.2d 581, 585 (8th Cir. 1984); see also $67,220.00, 957 F.2d at 285 (traveling under own name reduces suspiciousness of travel). Couriers also commonly deny that they are carrying money or lie about the amount they are carrying. See

---

evidence of drug crime is missing: $4,255,625.39; United States v. $42,500.00, 283 F.3d 977 (9th Cir. 2002); United States v. $141,770.00, 157 F.3d 600 (8th Cir. 1998); and $129,727.00. We believe these cases present more compelling facts for forfeiture than this one. In $42,500.00, the claimant -- who said she was claiming as bailee, but repeatedly would not provide contact information for the supposed bailor -- admitted to being a currency courier and told law enforcement officers that she was just carrying the bag with instructions to deliver it to "Jose." 283 F.3d at 980. In $141,770.00, the money was wrapped in dryer sheets, triple bagged in ziplock bags, and hidden in the ceiling panel of a vehicle; the claimants lied to law enforcement officers about having money. 157 F.3d at 602. In $129,727.00, the currency was wrapped in dryer sheets and plastic wrap; also, the claimant lied about the amount of money he was carrying. 129 F.3d at 488.

Despite these cases, the government actually claims that probable cause is supported by the fact that Stanford has no prior association with drugs, that is, she seems so innocent. They claim that common sense says drug organizations will select couriers who have no drug history. A problem with this argument's strength is that we, and other circuit courts, have repeatedly said -- and the government has repeatedly argued -- that a courier's history of involvement with drug crimes is a factor that supports a finding of probable cause.

$67,220.00, 957 F.2d at 286; see also United States v. $10,700.00, 258 F.3d 215, 232 (3d Cir. 2001)("it is significant that claimants did not lie about the amount of cash they possessed . . . and they immediately claimed ownership of the money after they voluntarily consented to the search of their bags. Both of those considerations weigh in claimants' favor in the probable cause calculus."). Stanford's traveling under her own name and her honesty about her possession of the currency and its amount go a long way to easing any suspiciousness raised by some evasiveness with the agents.

Third, Claimant is associated with a business, Mike's, that actively deals in cash transactions; and Mike's has not been shown to be some sort of criminal enterprise.[22] From the outset, she had, and has, a plausible explanation for honestly having the cash.[23]

---

[22] That, on at least two prior occasions, Stanford has flown on a commercial airliner with thousands of dollars in currency for her business is uncontested. She was flying from Suriname to the United States; and, on these international flights, both times she filled out customs declarations for the currency.

[23] The government waited about five months after seizing the funds before filing the forfeiture petition and had more than two years to prepare for the forfeiture hearing. In that time, an investigation was undertaken. Agent Miles admitted that the government's pre-hearing investigation discovered no evidence indicating Stanford's explanation was actually false. Agent Miles had the following exchange with Stanford's lawyer:

> Q. Did you acquire and corroborate any information that suggested that when Ms. Stanford said that her brother called her and asked her to pick up money for their business that wasn't true, did you develop it?

22

Courts exist largely to draw lines. When courts are called on to declare the legal consequences of a set of facts, the courts are called on to draw lines in which cases may be near each other but, still, on opposite sides.[24] In this forfeiture case, we have an American-citizen, a business person, with no criminal record (traveling home under her own name openly, on a public carrier) who has never denied that she was carrying a large amount of cash. In support of probable cause for forfeiture, the Government mainly points to some evasiveness with the agents, the large amount of currency, the fact that the currency was wrapped in black plastic

---

A.   All the information developed to that point indicated that that could have been true.

Q.   I'll take that as a no unless you tell me I'm wrong. No you didn't develop any such information?

A.   No further information, no, that that was not true, no.

By the way, no evidence in the government's case suggests that the government, as part of their investigation before the hearing, tried unsuccessfully to find Stanford's brother or that the brother would not cooperate with the government's investigation.

[24] The district court thought that, on the facts, it was not obvious that probable cause had been met. During the hearing, the judge made this observation: "I think all those circumstances point towards the activity of the drug courier, certainly nowhere close to a reasonable doubt standard, and I think it's frankly a close question, given those cases, as to whether there's a probable cause standard. So that's why I think you all ought to really consider that case law and see if you can resolve it, but otherwise I think I'll try to write the best decision I can, and the Eleventh Circuit will have to deal with it too." Then, later in his written opinion, he says again that needed probable cause was "admittedly a close question."
We respect the district court's view, especially its findings of historical fact; but in our judgment, the totality of circumstances in this case is legally insufficient to support the conclusion of probable cause in this case.

23

and a Christmas bag, the travel between source cities, the cash ticket, the changed itinerary, and the dog alert. We accept that collectively the elements relied upon by the government might point toward a possible connection to crime. But they only hint at crime: a suggestion well short of showing probable cause that a "substantial connection" exists between the funds at issue here and a narcotics transaction.

While the government's evidence might induce someone to suspect that a "substantial connection" to a crime exists, more than suspicion is necessary; and the connection must be to drug crime, not to crime in general. For a forfeiture, the government's evidence here is insufficient to cause a reasonably cautious person to believe -- to have some confidence, not just to imagine that it could be possible -- that the currency was substantially connected to a drug crime. Under the law, this record is not enough to justify the government's taking and keeping forever the money.

We believe we have looked at every published federal appellate decision discussing probable cause for forfeiture under § 881 and are unaware of a case concluding that the needed probable cause existed on a record like this one: a record this thin on facts connecting the pertinent property to an illegal drug transaction. The government seems to know of no such case either. At trial, when

the district court asked for the best Eleventh Circuit case, the Government cited

United States v. Carrell, 252 F.3d 1193 (11th Cir. 2001). When we asked for the

best case at oral argument, the Government cited $67,220.00. Both cases present

facts significantly more compelling than those presented here.[25]

The claimant in $67,200.00, Robert Easterly, lied to the government about

the money he was carrying. $67,220.00, 957 F.2d at 286. He initially falsely told

the government that he was carrying "about five thousand dollars," and he later

falsely said he was carrying "about $20,000." Id. at 281. He falsely told the

government that the money had come from his business and asked his boss to lie

to the investigators and "vouch that the seized cash was Budget Gold's money so

that Easterly could get it back." Id. at 283. Here, the evidence indicates that

Stanford has not engaged in this kind of deception. She never denied that she was

carrying cash; and her statements about the amount of cash, while not accurate to

---

[25] At one point at the district court hearing, the government lawyer cited United States v. $91,960.00, 897 F.2d 1457 (8th Cir. 1990), as a case finding probable cause "based on the same factors, less factors then we presented in this case." After hearing this representation, the district court commented "it's a little reckless to say less facts than are present in this case I think." In $91,960.00, the claimant, Luis Rosario, was traveling under a false name, gave three different stories about the source of the money he was carrying, had a notebook with his currency that the DEA agents testified contained notations of drug transactions, had a prior arrest for heroin possession which he lied to the agents about, and was subsequently arrested and convicted for marijuana distribution. Id. at 1459-63. Also in $91,960.00, the Eighth Circuit applied a clearly erroneous standard of review to the district court's finding of probable cause while our precedent dictates a de novo standard. Id. at 1462; see $121,100.00, 999 F.2d at 1507. This case is nothing like $91,960.00.

25

the penny, were a close and reasonable approximation of the actual dollar amount. No evidence suggests that she asked anyone to lie for her. This case is not comparable to $67,220.00.

This case is not comparable to Carrell either. In Carrell, the government was able to trace the forfeited property directly to the proceeds of illegal drug sales. Carrell, 252 F.3d at 1201.

> [T]he government demonstrated probable cause that the first property titled in Scottie Carrell's name was purchased with the proceeds of Homer Carrell's marijuana and cocaine sales because he had no other legitimate source of income. Regarding the second property, the government's investigation revealed that the sixteen cars that belonged to Homer Carrell's mother that were exchanged for the property were purchased with Homer Carrell's drug proceeds.

Id. The court, in Carrell, concluded there was "ample evidence" of a substantial connection between the forfeited property and the marijuana and cocaine sales of Homer Carrell. Id. at 1202. In this case, the Government has offered no evidence that directly connects Stanford's money to illegal drug transactions. While this lack of direct evidence does not necessarily mean forfeiture is inappropriate, it does mean that Carrell is not instructive.

We suppose that our closest cases finding probable cause are $121,100.00, and $4,255,625.39. This case, however, is considerably weaker than either of those cases. $121,100.00 involved a person with a history of narcotics

26

convictions, traveling under a false name, who purchased an expensive ($600) airline ticket with cash, was carrying a large sum of money to which a dog alerted, and planned only a single-day trip. $121,100.00, 999 F.2d at 1507-08. The $121,100.00 court indicated that the prior narcotics convictions were critical to its probable-cause determination. Id. Stanford's case is somewhat similar; but she did not travel under a false name, she purchased an inexpensive airline ticket and, very important, no evidence was presented that she had a history of involvement in drug transactions.

$4,255,625.39 involved a much greater amount of money, over seven million dollars, and had a Colombia connection. $4,255,625.39, 762 F.2d at 902. Probable cause, in $4,255,625.39, was based on an eight-month-long series of transactions involving over two-hundred-and-forty-two million dollars. Id. In addition to the amount of money, the $4,255,625.39 court pointed to nine elements supporting probable cause, only two of which are even arguably present here. Id. at 903.[26] Of the $4,255,625.39 elements that are not present here, we believe these

---

[26] The $4,255,625.39 elements that are arguably present here are (1) "the money was delivered . . . by Colombian couriers, many of whom were unidentified," and (2) "the cash consisted of small and medium denomination bills." $4,255,625.39, 762, F.2d at 903. The elements are similar to the elements here. We believe that the differences between these similar elements are significant, however. The money in $4,255,625.39 was delivered by Colombian couriers, and the claimant was a Colombian citizen. But Stanford is an American resident and citizen from Suriname, and she received the money from Surinamese people. Colombia is a notorious source of drugs to the United States. Suriname is not. DEA Resources, For Law Enforcement Officers, Intelligence Reports, The

are significant: (1) on at least one occasion, the cash was delivered in the trunk of a car equipped with secret compartments that was abandoned when the couriers were followed, (2) the bank charged an unusually high service fee for the claimant's account, and (3) the claimant had requested an "unusual" loan from the bank in which the funds were deposited to protect the funds in the event they were subject to forfeiture. Id. at 903. In addition, the claimant had falsely described the source of the money to his employee. Id. at 900. Furthermore, the claimant, before the forfeiture proceedings started, had -- more than once -- told bank officials dealing with the money that "perhaps he was dealing with people who were . . . involved in the drug business." Id. at 899 & 900. In contrast, as far as the record shows, Stanford has never suggested to anyone, at any time, that this money has any links to illegal drugs. We recognize that the present case involves elements, such as the dog alert, that were absent in $4,255,625.39. But, in our view, $4,255,625.39 was a much stronger case; and we cannot say that it supports a finding of probable cause for forfeiture here.

---

Drug Trade in the Caribbean: A Threat Assessment, at http://www.usdoj.gov/dea/pubs/intel/01019 (last visited June 27, 2003)(While Suriname is not without drug export activity, "Suriname is not considered a major transit point for drugs destined to the United States or an important money laundering center . . . .").

If we were to determine probable cause existed on the facts of the present case, we would be significantly extending (not just following) the precedents. The government asks us, in essence, to redraw the probable cause line for forfeiture beyond the borders of $121,100.00 and $4,255,625.39 so that the new borders contain this case. It asks us to redraw the line further then we -- or any other circuit court -- have drawn it. We are mindful of the precedent we would set if we upheld probable cause for forfeiture on this thin a record. Every seemingly Hispanic[27] resident of Miami traveling with considerable cash back to their home by common carrier on a cheap cash ticket would have several strikes against them automatically, especially considering how much cash has traces of illegal drugs on it nowadays. The result would be to vest the executive branch of the government with tremendous discretionary power in dealing with people in South Florida when it comes to taking their property. We do not believe this approach was

---

[27] Stanford says she is black and not Hispanic; the agents testified that they believed her to be Hispanic when they seized the currency. The DEA Form-6 Report of Investigation, prepared by Agent Miles after the seizure, described Stanford as a "Hispanic black female."

Congress' intent.[28]  And we see no good reason to extend the precedents in this

way.  We decline to do so.[29]

As Justice Holmes noted, "[i]t sometimes is difficult to fix boundary stones

between the private right of property and the police power when, as in the case at

bar, we know of few decisions that are very much in point."  Hudson County

Water Co. v. McCarter, 28 S.Ct. 529, 531 (1908).  But as Justice Holmes also

noted, "[n]either are we troubled by the question where to draw the line.  That is

the question in pretty much everything worth arguing in the law."  Irwin v. Gavit,

45 S.Ct. 475, 476 (1925).

---

[28] In 2000, Congress passed the Civil Asset Forfeiture Reform Act (CAFRA) and raised the government's burden to establish a forfeiture from probable cause to preponderance of the evidence. In passing the Act, Congress was concerned that the preexisting civil forfeiture procedures (the ones which govern this case) inadequately protected private property and allowed "numerous controversial seizures of property."  See 146 Cong. Rec. S1759 (daily ed. Mar. 27, 2000) (Statement of Sen. Hatch).  We understand, of course, that pre-CAFRA law governs this appeal.  Nevertheless, we are especially reluctant to broaden the case law to enlarge the circumstances that make property subject to forfeiture under §881(a)(6) against the background of a Congress that was attempting to narrow its scope.

[29] We are not the only circuit court to decline; we are aware of several cases presenting similar facts where other circuits have refused to allow a finding of probable cause.  See United States v. $10,700.00, 258 F.3d 215 (3d Cir. 2001)(despite the fact that the claimants had prior drug convictions); United States v. $49,576.00, 116 F.3d 425 (9th Cir. 1997)(despite facts that the claimant lied about having the cash, denied ownership of it and had been detained before in drug-related matters (but not charged)); United States v. $5,000.00, 40 F.3d 846 (6th Cir. 1994)(despite one claimant had prior drug use conviction); United States v. $30,060.00, 39 F.3d 1039 (9th Cir. 1994); United States v. $7,850.00, 7 F.3d 1355 (8th Cir. 1993); United States v. $31,990.00, 982 F.2d 851 (2d Cir. 1993); United States v. $53,082.00, 985 F.2d 245 (6th Cir. 1993).

For further support for no probable cause in this case, see United States v. Twenty Cashier's Checks, 897 F.2d 1567 (11th Cir. 1990), and the discussion of it in United States v. Four Parcels of Real Property, 941 F.2d 1428, 1442 n.30 (11th Cir. 1991)(en banc).

In this country, forfeitures are not favored. Forfeitures should be enforced only when they satisfy both the letter and the spirit of the law. See United States v. One 1936 Model Ford V-8 De Luxe Coach, 59 S.Ct. 861, 865 (1939); United States v. $38,000.00, 816 F.2d 1538, 1547 (11th Cir. 1987) ("Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required."). Forfeiture, therefore, should be allowed only when the circumstances are definitely sufficient to establish probable cause to tie the pertinent property in a substantial way to an illegal drug transaction. Given the deficiencies -- even viewed collectively and with a practical eye -- of the elements presented, and the complete lack of evidence connecting the seized money directly to illegal narcotics, the government's case here falls short of the probable-cause line for a forfeiture.[30] This citizen can keep her property.

_____

[30] We stress what we do not decide today: we do not decide that the circumstances pointed to by the government would necessarily be inadequate to support an arrest (with or without a warrant) or a search (with or without a warrant). Other kinds of cases are not before us; so, every word we have written must be read in the context of a forfeiture case. Courts have observed that the quantum of evidence necessary to meet the probable cause standard may possibly vary from one kind of case to another depending on what kind of government act the probable cause is to justify, even when the probable cause test is articulated in basically the same way. For background, see Aguilar v. Texas, 84 S.Ct. 1509, 1512 (1964), abrogated on other grounds, Illinois v. Gates, 103 S.Ct. 2317 (1983)("[W]hen a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' and will sustain the judicial determination so long as 'there was substantial basis for (the magistrate) to conclude'" that a crime had been committed.); Camara v. Municipal Court of the City and County of San Francisco, 87 S.Ct. 1727, 1736 (1967) (concluding that, in the administrative search context, the probable cause test focuses on the reasonableness of the search in the light of the public interest

REVERSED with instructions to enter judgment for Claimant.

------

involved rather than the quantum of evidence); West Point-Pepperell, Inc. v. Donovan, 689 F.2d 950, 958 (11th Cir. 1982)("Accordingly, administrative search warrants may be obtained upon a lesser showing of probable cause than is required for criminal search warrants . . . ."); Williams v. Kobel, 789 F.2d 463, 469 (7th Cir. 1986)("[I]t is clear to us that the probable cause determination at the preliminary hearing is far more stringent and far more concerned with legal technicalities than the probable cause determination made by an arresting officer at the scene of an arrest immediately after the commission of a crime."); United States v. Shomo, 786 F.2d 981, 983 (10th Cir. 1986) ("In keeping with the Fourth Amendment's strong preference for warrants, we are more likely to affirm a law enforcement officer's determination of probable cause when it is backed by the authority of a search warrant."); Wisconsin v. DeSmidt, 454 N.W. 2d 780, 785 (Wis. 1990) ("The quantum of evidence necessary to support a finding of probable cause for a search warrant is less than that required . . . for bindover following a preliminary examination."); Maine v. Libby, 453 A.2d 481, 485 (Me. 1982) ("more evidence is needed to justify an officer in making a search without a warrant than is required for finding probable cause for issuance of a search warrant."); Myers v. Commonwealth, 298 N.E.2d 819, 823 (Mass. 1973)("The minimum quantum of evidence required by [the] bind-over standard is more than that for probable cause for arrest . . .."); The People v. Madden, 471 P.2d 971, 974 (Ca. 1970)("a greater showing of probable cause is required to justify an arrest without a warrant than to justify a search pursuant to a warrant").

POGUE,  Judge, concurring:

I concur in Judge Edmonson's opinion.  I write separately to note the constitutional difficulty of finding probable cause based on the dog alert, the NADDIS report, or any possible inconsistency in Ms. Stanford's answer to the DEA agents' questions.

The District Court found that Ms. Stanford was not "seized" when the agents approached her at the gate, that she voluntarily consented to accompany the agents to the DEA office for further questions, and that the agents had "by that time developed reasonable, articulable suspicion of possible criminal activity." United States v. $282,484.00, (S.D. Fla. Oct. 5, 2001) (Mem.) Rec. Ex. 79 at 9. None of these finding are clearly erroneous.  The District Court, however, did not make any determination with regard to the length of Ms. Stanford's detention or whether the length of that detention may have transformed a justifiable seizure into an unlawful arrest.

The determination whether a detention has become a de facto arrest is made by considering the totality of the circumstances, rather than by the application of a bright-line rule.  United States v. Sharpe, 470 U.S. 675, 685 (1985); United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989).  In determining when a person has been arrested, the court asks at what point, "in view of all the

33

circumstances surrounding the incident, a reasonable person would have believed he [she] was not free to leave." Hastamorir, 881 F.2d at 1556 (quoting United States v. Hammock, 860 F.2d 390, 393 (11th Cir. 1988)). Among the circumstances courts have considered are "the blocking of an individual's path or the impeding of his progress; the retention of a ticket or piece of identification; an officer's statement that the individual is the subject of an investigation, or that a truly innocent person would cooperate with the law enforcement officer; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual." Hammock, 860 F.2d at 393. When the totality of circumstances indicates that "an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required." United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986) (citing Florida v. Royer, 460 U.S. 491, 499-500 (1983)).

"[T]he brevity of an invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." United States v. Sharpe, 470 U.S. at 685 (internal citations omitted); United States v. Place, 462 U.S. 696, 709 (1983); United States v. Hensley, 469 U.S. 221, 235 (1985); Florida v. Royer,

34

460 U.S. at 500. However, the Supreme Court has also "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Sharpe, 470 U.S. at 685. The Court stated that "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Sharpe, 470 U.S. at 685. "[T]he touchstone of the Fourth Amendment is reasonableness," Ohio v. Robinette, 519 U.S. at 39 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)), and the length of time that the courts will find reasonable is governed by "common sense and ordinary human experience" rather than "rigid criteria." Sharpe, 470 U.S. at 686; United States v. Montoya de Hernandez, 473 U.S. 531 (1985) (finding that a sixteen hour detention of an individual reasonably suspected of smuggling narcotics in her alimentary canal was reasonable under the circumstances);[1] see also Illinois v. McArthur, 531 U.S. 326 (2001) (holding that preventing an individual from re-entering his home unaccompanied by police for two hours while police obtained a search warrant

---

[1] It should be noted that the underlying events in Montoya de Hernandez took place at the border, "where the Fourth Amendment balance of interests leans heavily to the Government." Thus, this case is likely at the outer limits of what may constitute a Terry stop.

was reasonable); <u>United States v. Hardy</u>, 855 F.2d 753 (11th Cir. 1988) (upholding a 50 minute traffic stop as reasonable under the circumstances).

Here, it is undisputed that Stanford's detention lasted between 2 and a half and three hours. During the detention, the officers questioned Stanford in detail about the currency and sent for a narcotics dog to inspect the luggage. In <u>United States v. Place</u>, the Supreme Court indicated that a 90 minute detention during which police obtained a narcotics dog to sniff the defendant's luggage was too long to be justifiable as an investigative stop. <u>Place</u>, 462 U.S. at 708-10. The decision in <u>Place</u> was based partly on the fact that police had advance notice of defendant's arrival and could have prearranged the dog. In the instant case, agents also had advance knowledge of Stanford's arrival, and the record suggests that the dog was sent for during the time that agents were questioning Stanford.

Because the length of the detention is not determinative, we would consider, following <u>Sharpe</u> and <u>Montoya de Hernandez</u> the overall reasonableness of the detention, and, following <u>United States v. Hardy</u>, the conditions of the detention in determining whether an arrest has taken place. <u>Hardy,</u> 855 F.2d at 760 & n.11.

Here, the agents not only failed to inform Stanford that she was free to leave, <u>see Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1978), but also took Stanford to their offices and held her bags and property. Those facts,

36

combined with the length of the detention, would make it difficult to conclude that Stanford was not under de facto arrest.

Finally, if the stop had become a de facto arrest, the information obtained by the agents could not constitute probable cause to believe that a crime had been or was being committed. "The scope of the detention must be carefully tailored to its underlying justification," Royer, 460 U.S. at 500. Certainly the initial investigation based on reasonable suspicion may reveal further information that constitutes probable cause. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 126 (2000) (brief investigative stop may result in officers learning "facts rising to the level of probable cause"); Terry v. Ohio, 392 U.S. 1, 30-31 (1968) (officer's reasonable suspicion of criminal activity justified brief seizure and search for weapons; search revealed weapons which constituted probable cause for arrest). Also, as noted above, the agents' questioning of Stanford in the office was either consensual or at least supported by reasonable suspicion. The questioning, however, did not appear to reveal additional information that could rise to the level of probable cause to believe that Stanford was a courier for a drug organization and Stanford was never so charged. Consequently, if there was never probable cause for Stanford's arrest, any information obtained subsequent to a de facto arrest could not be used as a basis for forfeiture of Stanford's property.

ANDERSON, Circuit Judge, dissenting:

Respectfully, I dissent. I conclude that the government did adduce sufficient evidence to satisfy the requisite probable cause standard, a reasonable ground for believing that the currency was substantially related to a drug crime.

The cumulative effect of the following evidence persuades me that the currency was substantially related to illegal activity:

- Stanford was either unable or unwilling to disclose to the agents, during their extended discussion at the DEA office at the airport, the identity of the persons from whom she received more than $242,000 in cash. One would ordinarily expect the president and owner of a legitimate business to know more about the persons with whom she was doing business than simply that they were "some people" from her home country; this is especially true in the circumstance of receiving more than $242,000 in cash.

- The currency was not only concealed, which is not unusual if one is going to carry large quantities of cash on public transportation, but was also wrapped in a plastic cellophane-like material, giving rise to a reasonable inference that there was an effort to conceal any odor of drugs.

- Stanford was either unable or unwilling to identify where she stayed during her visit of several days in New York, or with whom she stayed, other than that they were "long-time friends."

- At one point, Stanford changed her story as to the reason for her visit to New York. Initially she said that she was involved in a court case that caused her to go to New York, but when the agents asked about the case, she changed her story and said that she had gone to pick up the money for the business.

38

- Although traveling with large quantities of cash is not illegal, it is unusual as part of a legitimate business practice, but, on the other hand, is commonplace in illegal activities, especially drug activities.

- Similarly, large quantities of cash in small denominations, and not bundled in the manner that banks use, is unusual in legitimate business practices, but commonplace in illegal activities, especially drug activities.

- Although the probative value of the dog alert is diminished for the reasons indicated by the majority, the dog alert nevertheless retains some probative value as evidence of illegal drug activity.

- Finally, Stanford paid cash for her airline ticket, scheduled a short trip between New York and Miami, and delayed her return several times. Although I agree with the majority that these facts are consistent with perfectly legitimate activity, and therefore have diminished value, nevertheless these facts are consistent with well known patterns of drug activity, and retain some probative value.

While the foregoing evidence persuades me that the government adduced evidence satisfying the probable cause standard that the currency was related to illegal activities, I agree that it is a closer question as to whether the necessary nexus to drug activity was established. Ultimately, however, I am persuaded that the government's evidence does establish a reasonable ground for believing that the currency was related to illegal drug activity. In my judgment, the cumulative effect of the following evidence is sufficient to satisfy that standard with respect to the drug nexus:

- The reasonable inference of an effort to mask a drug odor arising from the way in which the currency was wrapped in a cellophane-type material.

- Of course, the large quantity of cash in small denominations is a possibility in other illegal activities, but much more likely is evidence of illegal drug activity, especially in view of other circumstances, including the brief visit by a Miami resident to New York and the cellophane wrapping.

- The dog alert.

In order to establish the requisite probable cause, the government is not required to prove that the nexus to illegal drug activity is more likely than not. All that the government is required to prove is that there is a reasonable ground for believing that there is such a nexus to drugs. I believe that the government has satisfied the requisite standard.

Finally, I do not believe that the length of the consensual discussion in the DEA office at the airport converted the confrontation at any point into an illegal arrest, in light of Stanford's consent and the evidence of illegal activity.

For the foregoing reasons, I respectfully dissent.