**UNITED STATES of America,
Plaintiff–Appellee,**

**Ruby Hysell, Claimant–Appellant,**

**v.**

**CURRENCY, U.S. $42,500.00,
Defendant.**

**No. 00–55875.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 2001

Filed March 13, 2002

As Amended March 26, 2002.

Richard M. Barnett, San Diego, CA, for the claimant-appellant.

Patrick K. O'Toole, United States Attorney, Rupert A. Linley, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before: SCHROEDER, Chief Judge, TROTT, and RAWLINSON, Circuit Judges.

Opinion by Judge TROTT; Concurrence by Judge TROTT.

TROTT, Circuit Judge.

Ruby Diane Hysell ("Hysell") appeals the district court's grant of forfeiture in favor of the United States on summary judgment. Hysell contends the government lacked probable cause to seek the forfeiture of $42,500 and thus, that she is entitled to go to trial in order to prove that the currency was not entangled with illegal drug transactions. We disagree. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's grant of summary judgment.

## I

## BACKGROUND

If Sherlock Holmes were recounting the tale of this case, he would no doubt call it *The Case of the Cellophane Claim.*

On April 17, 1998, Hysell flew from New York to San Diego on a round-trip ticket scheduled to return in one week. Based on a referral from task force officer Kevin O'Malley of the San Francisco DEA/Airport Interdiction Unit, task force officers Weil and Hansen greeted Hysell at the San Diego airport. Weil and Hansen identified themselves and asked if they could

search Hysell's luggage. Hysell consented to the search.

While waiting for the luggage to arrive at baggage claim, Hysell told the officers that she did not pack all the contents of the luggage she was carrying. According to her, she met a man, previously unknown to her, at the JFK airport who identified himself only as "Samuel." Samuel allegedly took Hysell's small bag, placed it in a larger black duffel bag that did not belong to her, locked the larger duffel bag, and left without giving Hysell the key. Hysell then checked the larger bag and its contents with the airlines and flew to San Diego.

With Hysell's permission, officers Weil and Hansen removed the lock from the larger bag and found (1) a large sum of money wrapped in cellophane in five separate bundles, and (2) Hysell's smaller duffel bag. The currency totaled $42,500 in small bills, specifically 159 tens, 1248 twenties, 119 fifties, and 100 hundreds. An on-duty narcotics canine, Sutter, subsequently "alerted" to the currency, indicating the money had recently been in contact with narcotics.

Hysell consensually accompanied the officers to the narcotics task force office for further questioning. During questioning, Hysell told the officers that she had recently graduated from film school and was in San Diego to assist in the production of an adult film. She claimed that she had been to San Diego on two prior occasions in connection with the same adult film, but could not identify anybody associated with the film company by full name or produce any corroborating telephone numbers or addresses. Moreover, she had no hotel reservations. Hysell disclaimed knowing who owned the money and signed a "Disclaimer Of Ownership Of Currency" form to that effect. The disclaimer lists the owner of the currency as "unknown."

The United States instituted this civil forfeiture action against the $42,500 as a drug related seizure under 21 U.S.C. § 881(a)(6). On April 30, 1999, Hysell, assisted by counsel, filed an ambiguous claim to the seized currency and signed it under penalty of perjury as "an owner, agent of the owner, and/or bailee of said currency." In her subsequent answer to the complaint and demand for a jury trial, she asserted as an affirmative defense that she was "an innocent owner."

The government moved for summary judgment. The district court granted the motion, finding: 1) probable cause to initiate the forfeiture; and 2) no genuine issue of material fact regarding the forfeitability of the currency. Hysell appeals.

## II

### STANDARD OF REVIEW

■ A grant of summary judgment is reviewed de novo. *Far Out Prods., Inc. v. Oskar,* 247 F.3d 986, 992 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* Summary judgment procedures must necessarily be construed in light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein. *United States v. One 56–Foot Motor Yacht Named Tahuna,* 702 F.2d 1276, 1281 (9th Cir.1983). Once probable cause has been demonstrated, forfeiture procedures shift the burden of proof to the claimant to come forward with competent evidence sufficient to support a verdict in her favor.

## III

### A. Probable Cause

■ Under 21 U.S.C. § 881(a)(6), seized money is subject to forfeiture if it is "(1)

furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws." *United States v. $191,910 in U.S. Currency,* 16 F.3d 1051, 1071 (9th Cir.1994). The government has the initial burden of establishing probable cause connecting the seized property with illegal drug transactions. *See* 19 U.S.C. § 1615 (2001). If the government meets its burden, the burden then shifts to Hysell to prove, by a preponderance of the evidence, that the money was not connected with illegal drug activity. *See United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.1984) (per curiam).

■ The determination of probable cause is based on the aggregate of facts, including circumstantial facts. *United States v. U.S. Currency, $30,060,* 39 F.3d 1039, 1041 (9th Cir.1994). The government must show that it had reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof. *Id.* Each case stands upon its own facts, and the presence or absence of any one fact is not dispositive; indeed probable cause is not an exacting standard. *See United States v. Padilla,* 888 F.2d 642, 644 (9th Cir. 1989).

■ In an attempt to regain possession of the currency, Hysell now claims it belongs not to her, but to "Gary Lankford" ("Lankford"), supposedly the adult film's executive producer. She claims that Lankford has asked her to retrieve his money from the government, but she has offered no paperwork or other evidence whatsoever to support this contention. According to Hysell, Lankford informed her prior to her fateful trip that she would receive money at the airport to be used to pay for equipment and "talent" for the film, and that she was to deliver the money

to Samuel's San Diego doppelganger, "Jose." Jose is another person with no last name and no other information that might be used to find him. Hysell therefore seeks to retrieve the money as bailee for its phantom owner.

The glaring hole in Hysell's case stems from her deliberate refusal to provide any information to the government or the district court about the supposed owner of the currency on whose behalf she claims to appear in court. In fact, the record creates reason to doubt that "Lankford" even exists.

Hysell submitted a declaration, under penalty of perjury, stating she earned only $4,000 during 1999, spent $2,600 on rent and car insurance, and the rest on the necessities of life. In addition, she claimed she had "no savings" or other accumulated wealth. Based on her asserted lack of cash, Hysell was permitted to give her sworn deposition telephonically, remaining in the East while government counsel questioned her from California. The government expected Hysell to testify that "Gary Lankford" owned the currency and she was simply its bailee. Therefore, the government requested that Hysell bring Lankford's telephone number to the deposition on November 18, 1999, so Lankford might be contacted to verify her story.

During Hysell's deposition, the government predictably asked for Lankford's telephone number. Hysell replied that she had his number "at home" and could get his address, but was unable to provide either to the government at that time. The government asked Hysell if she could retrieve Lankford's telephone number and address by the time of a continuation of the deposition. Hysell's attorney, Mr. Barnett, interrupted and did not allow his client to answer on the pretext that the question was "improper."

Shortly thereafter, counsel for the government said,

Counsel, I wish to continue this deposition for the purpose of getting the documentation as to the phone number of Mr. Lankford, which was requested in the notice of deposition....

To this reasonable request, Mr. Barnett responded as follows:

My only comment is that as to the deposition request, I don't believe that the phone number is a quote documentation supporting the ownership of the defendant's property unquote and we've already stated our objection on the tax basis.

In response, the government's lawyer said,

Ms. Hysell, can you also furnish that telephone number to counsel to forward to me at your earliest convenience? The telephone number of Mr. Lankford.

Mr. Barnett answered for his client:

I think we'll stipulate that she has the ability to forward it to me. Is there anything else?

There was not.

The next relevant entry in the record concerning Lankford's available but withheld telephone number is a declaration executed and signed by the government's attorney, Rupert Linley, on February 25, 2000. The declaration states: "Since the date of the telephonic interview, November 18, 1999, I have asked Ms. Hysell's attorney, Richard Barnett, for the telephone number and address of 'Gary Lankford.' I have never received that information." The record does not contain anything to refute Mr. Linley's declaration.

In this case, we are confronted with the following undisputed facts: (1) Hysell was traveling from New York to San Diego, well known source cities for drugs; (2) Hysell checked one piece of locked luggage which did not belong to her and for which she did not have the key; (3) five bundles of currency, wrapped in cellophane, totaling $42,500, were found inside the locked luggage; (4) Hysell admitted she acquired the bag containing the money from a man, identified only as "Samuel", no last name or further useful description, whom she met for the first time at the airport; (5) Hysell admitted she was to deliver money to a man she identifies only as "Jose"; (6) Hysell was unaware of the amount of money she was carrying and was surprised by the substantial amount when the bag was opened at the airport; (7) Sutter, a drug-sniffing dog, alerted to the money in the bag Hysell was carrying; (8) Hysell disclaimed knowing who owned the money and signed an official document to that effect; (9) Hysell asserts that she is not the owner of the money, but appears on behalf of a phantom owner who refuses to come forward and about whom nothing else relevant is known; (10) Hysell and her attorney have refused to disclose to the government information in their possession that would allow the government to verify her story that "Lankford" owns the disputed currency and has asked Hysell as his agent to retrieve it.

While several of these facts taken alone, such as cross-country travel without hotel reservations and traveling without the key to locked luggage, would not create probable cause, the aggregate of facts raise more than a mere suspicion of a connection between the seized money and drugs; they establish probable cause to initiate civil forfeiture.

■ We have previously held that possession of a large amount of cash is "strong evidence that the money was furnished or intended to be furnished in return for drugs." *$93,685.61 in U.S. Currency*, 730 F.2d at 572. A large amount of money standing alone, however, is insufficient to establish probable cause. *See*

*$191,910 in U.S. Currency,* 16 F.3d at 1072. Here, Hysell was carrying a substantial sum of money, $42,500 in cash, obtained from an unknown man, to be delivered to another man, identified only as Jose. Hysell denied knowing who owned the funds she carried across the country and disclaimed ownership both verbally and in writing.

We find significant that the money was wrapped in cellophane. Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money. Rather cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs. *See United States v. $129,727 U.S. Currency,* 129 F.3d 486, 490 (9th Cir.1997) (linking money wrapped in fabric softener sheets and plastic wrap with drug related activity). Hysell offers no competent evidence suggesting an innocent reason for packaging the currency in this unusual fashion.

In addition, Sutter alerted to the money found in Hysell's luggage. Sutter's handler submitted a declaration stating that Sutter does not alert to cocaine residue found on currency in general circulation. Rather, Sutter alerts to a by-product of cocaine which does not linger on currency. We recently held that a sophisticated dog alert, where the dog reacts only to ephemeral by-products of narcotics and not to commonly circulated currency, is an important factor in determining probable cause. *See United States v. $22,474 in U.S. Currency,* 246 F.3d 1212, 1216 (9th Cir.2001) (explaining that because of more sophisticated training a narcotics canine would not alert to money unless it had recently been in the proximity of cocaine). The evidence of Sutter's sophisticated training is undisputed, and therefore, Sutter's alert is relevant in determining probable cause.

Hysell relies on *U.S. Currency, $30,060* to diminish the probative value of Sutter's alert. 39 F.3d at 1041–44. In that case we discounted an alert by a trained dog when presented with uncontroverted evidence that seventy-five percent of circulated money in Los Angeles was contaminated by residues from controlled substances. *Id.* More recently, however, we reaffirmed the importance of alerts from drug dogs trained to detect transient by-products from narcotics, indicating recent contact with drugs. *$22,474 in U.S. Currency,* 246 F.3d at 1216. As Sutter has been trained in such a manner, we reject Hysell's reliance on *U.S. Currency, $30,060.*

Hysell also relies on *United States v. $49,576 U.S. Currency,* 116 F.3d 425 (9th Cir.1997) to support her argument that the government failed to establish probable cause. In that case, we reversed the district court's finding of probable cause because there was no link between the seized money and illegal drug activities. The claimant in that case fit a drug courier profile, gave dishonest answers when questioned, walked in a nervous manner, had inconsistent identifications, and did not have the key to unlock his luggage. Officers discovered a large amount of money wrapped in jeans in the luggage, a drug dog alerted to the money, and the claimant denied ownership of the money at the time of the search. He had also been detained in the past for a drug related crime but was never charged. The government relied heavily upon the dog alert and the prior detention for a drug related crime to establish probable cause. We discounted the dog alert based on *U.S. Currency, $30,060,* and gave no weight to the detention because the claimant had never been charged with the crime.

While some of the facts in *$49,576 U.S. Currency* are similar to the present case, our treatment of drug dog alerts has become more discriminating since we decided that case, and key factors differ. In this

case, Sutter's alert is afforded greater weight due to the undisputed evidence that Sutter had sophisticated training and would not alert to generally circulated currency. *See $22,474 in U.S. Currency,* 246 F.3d at 1216. In addition, the packaging of the money differs. The wrapping of cash in cellophane, as compared to blue jeans, has materially different implications. As noted earlier, cellophane is highly impermeable to gas and commonly used to stave off detection by trained drug dogs; blue jeans could not possibly have the same effect.

Finally, we come to "Lankford." Out of an abundance of caution, and in fairness to Mr. Barnett, we issued an order after oral argument requesting that Mr. Barnett either confirm his failure to provide the government with the requested information about "Gary Lankford," or direct our attention to anything in the record refuting the government's contentions. Mr. Barnett has responded, confirming what the record shows. To quote his response, "[t]he telephone number was not later produced by Ms. Hysell or her counsel, Richard Barnett."

A court is not a place to play hide-and-go-seek with relevant evidence and information. Lankford's information was certainly relevant, for when one claims an interest in forfeitable property as a bailee, the identity of the purported owner, as well as sufficient information to investigate the validity of the claim of an owner-bailee relationship, are needed.

■ A similar set of facts and circumstances caused the Fifth Circuit to hold that an alleged bailee who withholds identification of the bailor lacks standing to attack the forfeiture. *United States v. $321,470, U.S. Currency,* 874 F.2d, 298, 304 (5th Cir.1989). While the government does not contend on appeal that Hysell lacks standing, the sage observations of

Judge John Minor Wisdom are relevant to the determination of probable cause:

> No one can question the standing of a bailee or agent to attack a forfeiture of property subject to a lawful or even colorably lawful bailment or agency. An armored car service, a commercial delivery company, an attorney carrying his client's papers need have no qualms about this case. The right of such bailees or agents to be protected from unreasonable searches and seizures is not affected by this decision. But a courier carrying cash from an unknown owner to an unknown recipient, resolute in his determination to give no explanation except that he was asked to transport cash, the ideal mule for drug traffickers, must be prepared to demonstrate that he has a lawful possessory interest. Unexplained naked possession of a cash hoard in the factual setting of this case does not rise to the level of the possessory interest requisite for standing to attack the forfeiture proceeding.

*Id.*

From the facts and circumstances of this case, including Hysell's steadfast refusal to identify her alleged principal, we conclude, as did the district court, that the government has shown convincing probable cause to initiate forfeiture proceedings. Accordingly, the burden shifts to Hysell to produce evidence sufficient for a reasonable fact finder to conclude that the currency is not related to drugs.

**B. Hysell's Failure to Create a Genuine Issue of Material Fact**

■ Hysell correctly states that at the summary judgment stage, she must produce evidence from which "a fair-minded jury could return a verdict for [her] on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). She failed to

do so. After examining the facts advanced by Hysell in response to the government's motion for summary judgment, including her refusal to produce any useful evidence that might illuminate and verify her story, we hold that no reasonable person could possibly find worthy of serious consideration Hysell's ever-expanding, contradictory, sophistical, and impenetrable story about the initially unknown and now effectively unidentified and hidden, alleged owner of the money. A reasonable person could not return a verdict for Hysell by a preponderance of the evidence based on the insubstantial "facts" presented, nor could a judge allow such a verdict to stand. This is indeed the situation contemplated in *United States v. Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487 (9th Cir.1990) where we described a case "so inherently untrustworthy that a rational trier of fact would reject it out of hand." *Id.* at 492. We do not render a judgment on Hysell's credibility per se, only on the quality of the evidence presented viewed in its most favorable light to her. Even with this advantage, her case utterly fails.

If anything, Hysell's transparent story, which depends entirely on withholding relevant information from the district court and the government, only bolsters the government's assertion that the money comes from drug trafficking. *See $321,470, U.S. Currency*, 874 F.2d at 304. As in *$321,470, U.S. Currency*, Hysell's "principal could have come forward and claimed title to the money. Failure to do so raises a strong inference that the [$42,500] was not as valuable as preserving the secrecy of the owner's identity." *Id.* at 304. The cellophane did not work, nor does her story. We therefore agree with the district court that Hysell failed to produce evidence that, viewed in the light most favorable to her, creates a genuine issue of material fact requiring a trial.

## IV

## CONCLUSION

The aggregate of undisputed facts establishes probable cause for the government to initiate forfeiture proceedings, and Hysell has failed to produce any evidence from which a reasonable fact finder could conclude that the money was not related to drug activities.[1]

AFFIRMED.

TROTT, Circuit Judge (Concurring):

The Preamble to the American Bar Association's Model Rules of Professional Conduct states:

> In all professional functions a lawyer should be competent, prompt and diligent....[,] should use the law's procedures only for legitimate purposes and not to harass or intimidate others....[, and ] should demonstrate respect for the legal system and those who serve it.

Model Rules of Prof'l Conduct, pmbl. ¶¶ 3–4.

It is a mistake to regard the adversary system as an opportunity to see what you can get away with or if you can pull the wool over a court's eyes. This case, as

---

1. We affirm the district court's denial of Mr. Barnett's request for additional discovery regarding the practices of the officers. The court correctly exercised its discretion in rejecting the clear attempt to draw this case into an inappropriate sideshow.

    Mr. Barnett has included with his response to our order regarding the record and "Gary Lankford" a request to raise an issue not heretofore mentioned in this case: that the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983, effective as of August 23, 2001, raised the government's burden of proof from probable cause to a preponderance of the evidence. We deny the motion as untimely, but we note that even under the heightened standard, Hysell would lose this case.

filed and pursued, gives every appearance that counsel is representing not Ms. Hysell, but protecting someone behind the scenes who prefers not to be identified. If Ms. Hysell is too indigent to afford to travel to San Diego for a deposition, and if she does not own this money, one can only wonder what arrangement counsel and "Lankford" have with respect to its disposition should they be successful in its recovery. Counsel's current argument regarding his performance during the deposition and afterwards that he "did not ever agree to produce[Lankford's'] telephone number and/or address outside of formal discovery" is the kind of assertion that draws the legal profession into ill repute.

Although private attorneys are held to different standards than government prosecutors, *see Berger v. United States*, 295 U.S. 78, 88–89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), such attorneys, as officers of the court and members of the bar, are universally required to file their cases with clean hands and pursue them with forthright presentations. The justice system expects lawyers, in cases like this one, aggressively to contest probable cause and to argue whatever legitimate positions will advance their client's causes. However, the law and the principles of legal ethics do not expect lawyers to attempt to game the system and deliberately withhold, without justification, available and relevant information germane to the outcome of litigation, as apparently has been done here. One can only hope that the momentary heat of battle has clouded someone's otherwise good judgment.