**UNITED STATES of America,
Plaintiff,**

v.

**$49,790 IN UNITED STATES
CURRENCY, Defendant.**

**Herman Keese, Claimant.**

**No. C 08–1654 VRW.**

United States District Court,
N.D. California.

Dec. 22, 2010.

Patricia Jean Kenney, U.S. Attorney's Office, San Francisco, CA, for Plaintiff.

David Martin Michael, Law Offices of David M. Michael, San Francisco, CA, for Claimant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

VAUGHN R. WALKER, Chief Judge.

The parties herein have submitted cross-motions for summary judgment. Doc. ## 34, 48. Claimant moves for the return of $49,790 in United States currency ("the currency" or "the currency at issue"), Doc. # 34, and the government cross-moves for forfeiture, arguing that the currency is substantially connected to drug trafficking. Doc. # 48.

The court held a hearing on the parties' motions on November 4, 2010, during which the parties mutually agreed to convert their motions for summary judgment into final submissions for adjudication: a bench trial on the papers. In so doing, the parties acknowledged that all of the facts relevant to adjudication are contained in their respective submissions and requested that the court make any credibility determinations or weigh evidence as necessary to rule. This, of course, the court may do, *Starsky v. Williams*, 512 F.2d 109, 112–13 (9th Cir.1975), as all relevant facts are contained in written record, *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038–39 n. 6 (9th Cir.2000) (quoting *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676 (9th Cir.1990)).

Presumably, the Ninth Circuit would review the court's findings under the "clearly erroneous" standard of FRCP 52(a). *Starsky*, 512 F.2d at 111. The court therefore treats the parties' motions as submissions for trial on the written record under FRCP 52.

The court now makes its findings of fact and conclusions of law pursuant to FRCP 52(a)(1):

FINDINGS OF FACT [1]

1. On October 17, 2007, United States Drug Enforcement Administration ("DEA") agents seized the currency at issue at a Federal Express ("FedEx") facility in South San Francisco, California.

2. After noticing a large white parcel, which had a handwritten airbill for priority overnight delivery and for which the sender had paid $62.93 in cash, DEA Task Force Agent Martin D. Mahon brought a certified narcotics detection dog, called Dugan, to sniff the area in which the parcel had been placed.

3. Dugan alerted to the parcel, which bore tracking number 8624 4882 5218, listed "Kevin Hope" of 1725 N. 54th Street, Philadelphia, (215) 207–3528, as sender, and "Deborah Barnes" of 350 Sweeney Street, San Francisco, California, (415) 902–3597, as recipient.

4. In truth, Brett Townsend—not "Kevin Hope"—sent the package. See CL–Forfeitability 5(E)(ii).

5. Dugan's alert indicated that the odor of illegal drugs was emanating from that parcel.

6. Agent Mahon obtained a state search warrant for the parcel and found a black notebook case inside. Inside that notebook case were two vacuum-sealed plastic bags containing the currency at issue, which was comprised of various denominations and bundled with rubber bands.

7. The DEA agents then secured a state search warrant for the parcel's purported destination, 350 Sweeney Street, San Francisco, California. The warrant was executed in the presence of claimant and his wife.

8. The next day, Agent Mahon spoke to claimant on the telephone, at which point claimant represented that he owned the currency.

9. On March 27, 2008, the government filed a complaint for forfeiture under 21 USC 881(a)(6), alleging that the currency was seized as drug proceeds or as money used to facilitate a drug transaction.

10. Claimant subsequently filed a verified claim alleging ownership of the currency.

11. The court, before turning to its conclusions of law, makes the following credibility determinations:

---

[1]. To the extent any of the findings of fact should more properly be considered conclusions of law, they shall be deemed as such.

A. Dr. Kenneth G. Furton, a purported expert on narcotics detection dogs, is not credible as to his opinions regarding Dugan's sophistication because Dr. Furton did not witness—or in any equivalent way evaluate—Dugan's alert to claimant's parcel.

B. The court assumes, for the sake of this order, that the testimony of Dr. Warren James Woodford, a purported expert on narcotics detection dogs, is credible.

C. Agent Mahon, a purported expert on narcotics detection dogs, is credible as to his opinions about Dugan's "sophistication" because Agent Mahon has over nine years training and handling narcotics detection dogs as a law enforcement agent, has specifically trained and handled Dugan since 2007, and because together, he and Dugan have been involved in over 200 narcotics searches. Agent Mahon's extensive experience with Dugan provides him with a strong basis for opining on Dugan's performance and reliability.

D. The court is thus faced with two competing expert theories: the government claims that Dugan is a "sophisticated" dog that is trained to alert only to contraband, while Woodford asserts that Dugan must have falsely alerted to the currency at issue. Simply put, the court finds the government's evidence to be more believable.

E. As explained further below, see CL–Forfeitability, the evidentiary value of Woodford's theories are negated entirely by the method and manner in which the currency at

issue was handled, packaged and delivered. See also FF 3–4.

F. The government's evidence, when considered together, is credible and is worthy of substantial weight.

G. Claimant's proposed innocent-owner narrative is not believable.

CONCLUSIONS OF LAW—EXPERT TESTIMONY [2]

1. An adequate *Daubert* analysis of every challenged expert opinion seems prudent in fulfilling the court's obligation to ensure actual conformance with FRE 702 as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

2. A proposed expert witness must qualify as an expert "by knowledge, skill, experience, training, or education." FRE 702.

3. Once a court finds that the proposed witness qualifies as an expert, it must determine whether expert testimony is both relevant and reliable, with a "basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire*, 526 U.S. at 147, 149, 119 S.Ct. 1167 (citing *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). This progression establishes a standard of evidentiary reliability, *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786, intended to ensure that the analysis "undergirding the expert's testimony falls within the range of accepted standards governing how [experts in the relevant field] conduct their research and reach their conclusions." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir.1995) (on remand) (*"Daubert II"*). The court's task "is to analyze not what

2. To the extent any of the conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

the experts say, but what basis they have for saying it." *Id.* at 1316. Accordingly, the court focuses on the "reliability of the methodology." *Id.* at 1319 n. 11.

A.  While the methodologies on which expert testimony may be based are not limited to what is generally accepted, *id.*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

B.  The party proffering the evidence "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable * * * method and followed it faithfully." *Daubert II*, 43 F.3d at 1319 n. 11.

C.  While there is no definitive checklist or test, *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786, courts have identified several non-exclusive and non-dispositive factors as potentially relevant to the reliability inquiry, including: (1) "whether a [method] * * * can be (and has been) tested," (2) "whether the [method] has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the [method's] operation," (5) "a * * * degree of acceptance" of the method within "a relevant * * * community," *id.* at 593–94, 113 S.Ct. 2786, (6) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation," *Daubert II*, 43 F.3d at 1317, (7) whether

the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see *Joiner*, 522 U.S. at 146, 118 S.Ct. 512, (8) whether the expert has adequately accounted for obvious alternative explanations, see generally *Claar v. Burlington N RR*, 29 F.3d 499 (9th Cir.1994), (9) whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167, and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, see *id.* at 151, 119 S.Ct. 1167.

4.  The government tenders Dr. Furton as an expert on narcotics-detection dogs. See Doc. # 49.

A.  In support of this classification, the government points to Dr. Furton's extensive qualifications. Dr. Furton holds a PhD in analytical chemistry, has years of experience in the study of odor signatures and is a former chair of the chemistry department at Florida International University. Since 1993, he has conducted extensive research on the scientific aspects of dog sniffs and has been retained to offer expert opinions on the subject in both state and federal courts. See id.; see also *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 457 (7th Cir. 2005) (opining on Dr. Furton's qualifications). Thus, Dr. Furton's expertise regarding narcotics detection dogs, acquired chiefly through years of education, training, experience and publications in analytical

chemistry and forensic science, qualifies him to testify on such subject matter.

B. Claimant takes issue with a number of Dr. Furton's opinions and challenges the reliability of Dr. Furton's methodologies. See Doc. # 56 at 9. In the court's view, Dr. Furton's only relevant opinion is in regard to Dugan's "sophistication." Dr. Furton states, and claimant disputes, that "Dugan, handled by DEA Task Force Officer Martin D. Mahon, and TFO Mahon acted consistently with their training and that the positive alert indicates that the Defendant $49,790 in this case had recently, or just before packaging been in close or actual proximity to a significant amount of narcotics." Doc. # 49 at 4. Although Dr. Furton may be well qualified to testify about sophisticated drug dogs in general, Dr. Furton has no reasonable basis to opine on Dugan's reliability in this particular instance. Dr. Furton was not present to witness the alert, nor was any videotape produced or created to memorialize the alert to allow Dr. Furton to analyze Dugan's conduct. Without direct observation of Dugan's alert, Dr. Furton's opinion is not reliable.

5. The government also tenders Agent Mahon as an expert on narcotics detection dogs. See Doc. ## 33, 40.

A. Claimant asserts that Agent Mahon is not qualified to testify on this subject matter because Agent Mahon is not a scientist and, in any case, has not, in his declaration or in any other admissible form, laid a scientific foundation to establish the relevance of Dugan's alert. Doc. # 56 at 7. Relevant expert testimony is not limited to "science"; it can be based on experience. See,

for example, *United States v. Freeman*, 498 F.3d 893, 901 n. 1 (9th Cir.2007) (affirming the law enforcement agent's qualification as an expert on the meaning of encoded drug jargon because he had more than four years of experience as a narcotics detective and had participated in over one hundred narcotics investigations). Contrary to claimant's position, Agent Mahon's testimony, as Dugan's trainer and handler, is relevant because it demonstrates the extent to which Dugan is a sophisticated and reliable drug dog. See *United States v. Outlaw*, 134 F.Supp.2d 807, 810–816 (W.D.Tex.2001) (vacated in part on alternate grounds). Agent Mahon has trained and handled over 20 narcotics detection canines as a law enforcement agent over the course of nine years. Doc. # 40 at 2–5. Because Agent Mahon has been training Dugan since 2007 and has supervised his performance in numerous narcotics detection training programs and examinations, Agent Mahon has personal knowledge of Dugan's training and is intimately familiar with Dugan's performance. Id. Thus, Agent Mahon is qualified to testify about Dugan's sophistication.

B. Agent Mahon offers the opinion that Dugan is a sophisticated dog because he is trained to detect the odor of marijuana, cocaine, heroin or methamphetamine and he does not alert to the odor of currency. Id. at 3. The reliability of Agent Mahon's testimony is based on his extensive observation and evaluation of Dugan. Agent Mahon and Dugan, together, have been involved in over 200 narcotics searches in training and in street deployment.

Id. at 4. Agent Mahon trained Dugan and helped Dugan obtain certification to detect cocaine and other controlled substances in October 2007. Since Dugan's initial certification, Dugan has had yearly certifications and has won a number of awards for his outstanding performance, in which Agent Mahon played an integral part as Dugan's handler. Dugan's training, certification and competition records corroborate Agent Mahon's opinion. Id. at 14–45. Thus, Agent Mahon's testimony is reliable and the court views Dugan as a "sophisticated" dog. See CL–Forfeitability 5(A)(ii).

6. Claimant tenders Dr. Woodford as an expert on narcotics detection dogs.[3] See Doc. # 57.

    A. In support of this classification, claimant points to Dr. Woodford's extensive qualifications. Dr. Furton holds a PhD in chemistry and has years of experience researching the detection of volatile organic chemicals in air by laboratory devices and by the olfactory senses of humans and dogs. Id. at 1. Dr. Woodford has testified, in both state and federal courts, about the training requirements and conditions for humans and canines to smell and detect the odors emitted by alcohol and drugs. Id. Moreover, Dr. Woodford discovered and patented methyl benzoate, the chemical odor and by-product of cocaine that sophisticated dogs are trained to de-

tect. Id. at 1–2. The court notes that the Seventh Circuit has previously taken issue with some of Dr. Woodford's expert opinions. See *United States v. Ingram,* 1999 WL 170319, *1, 1999 U.S.App. LEXIS 6074, *2 (7th Cir.1999) (unpublished) ("Dr. Woodford's idiosyncratic theories have been uniformly rejected * * * and in addition it turns out that the curriculum vitae which he submitted to the court contained the false representation that he is licensed by the DEA to conduct tests on controlled substances."). In short, the court is not convinced that the testimony of Woodford passes *Daubert* scrutiny; nevertheless, for the purposes of its ruling, the court will assume that: (i) Dr. Woodford is qualified to testify about cocaine detection dogs based on his combined experience of education, training and research and (ii) that his opinions are reliable.

## CONCLUSIONS OF LAW—FORFEITABILITY [4]

1. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 USC § 983, governs forfeiture proceedings commenced after its effective date—August 23, 2000.

2. CAFRA places the burden of proof on the government to establish forfeiture by a preponderance of the evidence. *United States v. $80,180.00 in U.S. Currency,* 303 F.3d 1182, 1184 (9th Cir.2002).

---

3. Claimant submitted Dr. Woodford's declaration with claimant's reply brief two weeks before the November 4, 2010 hearing date. See Doc. ## 56, 57. The government subsequently moved to strike Dr. Woodford's declaration, arguing that it did not have a meaningful opportunity to respond to Dr. Woodford's expert testimony. See Doc. # 60. The court agrees, but rather than

striking Dr. Woodford's declaration, the court interprets the government's motion as a challenge to Dr. Woodford's expertise. Accordingly, the court conducts a *Daubert* analysis as to Dr. Woodford's testimony.

4. To the extent any of the conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

3. A forfeiture claim brought under 21 USC § 881(a)(6) requires the government to show, by a preponderance of the evidence, a "substantial connection" between the currency at issue and the alleged illegal drug activity. See, for example, *United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1187 (9th Cir.1995); *United States v. $32,000 in United States Currency*, 2007 U.S. Dist. LEXIS 38147, *5 (D.Ariz.).

4. The determination whether the government has met its burden of proof is based on the aggregate of the facts, including circumstantial evidence. *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980 (9th Cir.2002).

5. The following facts surrounding the seizure of the currency, in the aggregate, lead the court to conclude by a preponderance of the evidence that the currency is substantially connected to illegal drug activity:

  A. Dugan alerted to the parcel containing the currency.

    i. The Ninth Circuit has given probative weight to positive alerts by "sophisticated" dogs—dogs that react only to ephemeral by-product of narcotics and not to commonly circulated currency—to show that currency is substantially connected to illegal drug activity. See *Currency, U.S. $42,500*, 283 F.3d at 982; *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001). Contra *United States v. U.S. Currency, $30,060*, 39 F.3d 1039, 1042 (9th Cir.1994).

    ii. Based on Agent Mahon's testimony and Dugan's training, certification and performance records, the court finds Dugan a sophisticated dog. See Doc. # 40.

  B. Claimant has a prior drug-related conviction and two prior drug-related forfeitures of substantial amounts of currency. See *United States v. Approximately $1.67 Million (US) in Cash, Stock, and Other Valuable Assets*, 513 F.3d 991, 999 (9th Cir.2008); *$22,474 in U.S. Currency*, 246 F.3d at 1217.

    i. Claimant was convicted in 1999 for possession of cocaine with intent to distribute and transporting cocaine with intent to distribute. Doc. # 40 at 10.

    ii. Claimant also had $141,370 and $40,425 forfeited from him in December 2004 and February 2007, respectively, as property intended to be furnished in exchange for a controlled substance or as proceeds traceable to such an exchange. Id. at 11.

  C. The currency at issue was bundled and placed inside vacuum-sealed plastic bags. See *Currency, U.S. $42,500*, 283 F.3d at 982 (finding that wrapping currency in cellophane or plastic reflects an attempt to reduce the odor of drugs and lessen the risk of detention by trained narcotics canines); *United States v. $129,727 U.S. Currency*, 129 F.3d 486, 490 (9th Cir.1997) (finding the nexus to drugs was provided by the distinctive manner in which the currency was wrapped in fabric softener sheets and plastic wrap). Contra *United States v. $49,576 U.S. Currency*, 116 F.3d 425, 427 (9th Cir.1997) (finding that currency wrapped inside a pair of blue jeans not probative). Like cellophane, vacuum-sealed plastic bags are highly impermeable to gas and commonly used to stave off detection by trained dogs. *Currency, U.S. $42,500*, 283 F.3d at 983.

  D. The large sum of cash that compromises the currency at issue. See *Currency, U.S. $42,500*, 283 F.3d at 981–82 (noting that a large amount of cash

is strong evidence that the money was furnished or intended to be furnished in return for drugs; however, possession of a large sum of money standing alone is insufficient to establish probable cause). The currency here constitutes a large sum of currency, which taken in conjunction with Dugan's alert, claimant's prior drug conviction and the fact that the currency at issue was placed in vacuum-sealed bags, is evidence to show a substantial connection to illegal drug trafficking.

E.  The method of delivery of the currency.

  i.  Claimant had the currency at issue shipped overnight through FedEx. See *United States v. $242,484*, 389 F.3d 1149, 1161 (11th Cir.2004) (noting that sending currency is a preferred method for drug dealers to transfer money because they can avoid leaving a paper trail).

  ii.  Claimant's cousin, Brett Townsend, who claims to have sent the FedEx parcel, filled out the handwritten airbill and used a phony name, false address and non-working telephone number. See *$17,700 in U.S. Currency*, 2008 U.S. Dist. LEXIS 96938, *15 (C.D.Cal.) (finding probative the fact that claimant used real names and correct addresses on the parcel).

  iii.  Agent Mahon's testimony supports the government's position that sending currency via FedEx is a common attribute and technique of persons involved in illegal drug activity. See *United States v. $129,727.00 United States Currency*, 129 F.3d 486, 491 (9th Cir.1997) (acceding to the expertise of officers with knowledge of the common at-tributes and techniques of persons involved in drug trade).

F.  The underwhelming evidence to show that the currency came from a legitimate source. The documentation claimant offers in support of his theory is limited and incomplete. As the court discusses in further detail below, claimant fails to show that the currency at issue originated from an alleged home mortgage loan claimant received.

6.  Based on the aggregate facts of this case, the court finds, by a preponderance of the evidence, that the currency at issue is substantially connected to illegal drug trafficking. See *Currency, U.S. $42,500*, 283 F.3d at 977; *$22,474 in U.S. Currency*, 246 F.3d at 1212.

7.  As a result, the court must address whether forfeiture may be prevented by claimant's innocent owner defense.

## CONCLUSIONS OF LAW—INNOCENT OWNERSHIP DEFENSE [5]

1.  The innocent owner defense is an affirmative defense in which claimant bears the burden of proving that he is an innocent owner by a preponderance of the evidence. 18 USC § 983(d)(1); *United States v. $10,560 U.S. Currency*, 2009 U.S. Dist. LEXIS 25800, *8 (E.D.Wash.).

2.  An innocent owner whose property interest was in existence at the time the illegal conduct giving rise to forfeiture took place is one who (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property. 18 USC § 983(d)(2); *United States v.*

---

**5.**  To the extent any of the conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

*$493,850 in U.S. Currency,* 518 F.3d 1159, 1170 (9th Cir.2008).

3. Claimant, relying on the first section 983(d)(2) factor, asserts that he is an innocent owner because the currency came from a legitimate source and was intended for purchasing inventory for his wife's 99–Cent Plus Store. Thus, claimant contends that he did not know the currency was connected to illegal drug activity. Doc. # 54 at 6–12.

4. The documentary evidence that claimant proffers to show that the currency came from a home mortgage loan does not establish by a preponderance of evidence that a loan was in fact procured and funds were distributed.

    A.  Claimant provides a home mortgage loan approval form from Wachovia bank as evidence that he received a loan in the amount of $101,263.50 on July 2, 2007. Doc. # 39–1 at 34–55. Claimant also provides a Wachovia bank statement as evidence that he deposited $100,000 of that loan into his personal bank account on July 6, 2007 and withdrew $50,000 cash on July 9, 2007, which he claims he subsequently hid in his mother's house. Doc. # 39–1 at 29–33.

    B.  Claimant, however, fails to establish, with documentary evidence, that the counter deposit of $100,000 on July 6, 2007, in fact originated from the proceeds of the home mortgage loan. Moreover, claimant obtained the alleged home loan from Wachovia bank, the same financial institution that manages claimant's personal bank account. Thus, if in fact the proceeds of the loan were disbursed to claimant, claimant should have the proper documentation to account for such disbursement. Claimant, carrying the burden of establishing that he is an innocent owner, fails to offer suffi-

cient documentation in support of his claim.

    C.  Claimant also fails to establish, with documentary evidence, that the proceeds of the home mortgage loan was disbursed before July 23, 2007, the date on which the lien against the property securing the loan was recorded. Claimant does not offer sufficient evidence or testimony which indicates that Wachovia disburses mortgage home loans before its security interest is recorded. Thus, because the title search on the property securing the loan shows that the lien was not recorded until July 23, 2007, the $100,000 that was deposited into claimant's bank account on July 6, 2007 is unlikely traceable to any such home loan disbursement.

5. The testimonial evidence that claimant proffers to show that the currency came from the home mortgage loan is not credible.

    A.  Claimant stated under oath that the $100,000 counter deposit into his bank account originated from the home mortgage loan and that he subsequently withdrew $50,000 in cash from that account, which became the currency at issue, Doc. # 50; but the court does not find credible claimant's testimony without adequate documentary evidence tracing the $100,000 counter deposit to the home mortgage loan. Absent such evidence, claimant's testimony is merely self-serving and uncorroborated.

    B.  Claimant also testified, at his deposition, that he took the $50,000 cash withdrawal and left it at his mother's house in Philadelphia. Doc. # 38 at 79. The truthfulness of claimant's testimony is questionable

because he gave conflicting stories about what he did with the $50,000 cash withdrawal. Claimant initially testified three times that he did not remember what he did with the cash. After a break in the deposition, claimant changed his testimony and testified that he took the cash to his mother's house in Philadelphia and left it there. Id. at 71–73.

C. Even if the court assumed that the $100,000 counter deposit originated from the home mortgage loan, it is doubtful whether the $50,000 cash withdrawal claimant purported to have been left at his mother's house is in fact the same currency his cousin retrieved and sent to him several months later because claimant's description of the $50,000 cash is at odds with his cousin's testimony. Claimant testified at his deposition that the $50,000 cash was pre-counted in bundles with bank-wrappers and was placed in a brown paper bag. Doc. # 38 at 66–69. He also stated that he took the bundles bound by bank-wrappers out of the brown paper bag and hid them in a large cardboard box approximately 36″ × 24″ × 26″ with his mother's clothing inside. Id. at 79–81. Claimant's cousin, however, testified that when he retrieved the $50,000 cash from claimant's mother's house, he found the cash in a bag on the top shelf of claimant's mother's closet—not in a cardboard box with clothing inside. Doc. # 37 at 33–34, 39–40.

6. Based on the evidence before the court, claimant fails to prove, by a preponderance of the evidence, that he is an innocent owner.

7. Accordingly, the court GRANTS the government's motion for forfeiture and DENIES claimant's motion for return of the currency.

## CONCLUSION

For the foregoing reasons, GRANTS the government's motion for final adjudication on the merits and DENIES that of the claimant. The clerk is DIRECTED to enter judgment in favor of the government and to close the file.

IT IS SO ORDERED.